IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:26-cr-114 (RDA) |
| | ) | |
| JEFFREY CHARLES WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Jeffrey Charles Williams's ("Defendant") Motion to Suppress and for a Franks Hearing (Dkt. 40), Motion to Suppress Statements (Dkt. 42), and Motion to Suppress Evidence from the March 10, 2026 Search and Seizure (Dkt. 54) (collectively, the "Suppression Motions"). Considering the Suppression Motions, Defendant's supporting memoranda (Dkts. 41, 43, 55), the Government's Oppositions (Dkts. 47, 48, 61), Defendant's Replies (Dkts. 59, 60), the parties' supplemental memoranda (Dkts. 84, 85), and the evidence and arguments presented at the October 14, 2026 hearing, this Court resolves the Suppression Motions as set forth below.[1]

## I. PROCEDURAL BACKGROUND

A Criminal Complaint and supporting Affidavit were filed on April 24, 2026. Dkts. 1, 2. On May 13, 2026, Defendant was arrested, appeared before U.S. Magistrate Judge Lindsey R. Vaala, and was temporarily detained pending further proceedings. Dkts. 7. On May 18, 2026, following preliminary hearings before Magistrate Judge William E. Fitzpatrick, Defendant was detained pending trial. Dkts. 12, 14.

[1] Consistent with the parties' agreement that Defendant's Motion in Limine is resolved, that Motion is DENIED AS MOOT.

On July 16, 2026, a federal grand jury indicted Defendant on seven counts. Dkt. 27. Those counts include: (i) two counts of possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Counts 1 and 4); (ii) two counts of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Counts 2, 5); (iii) two counts of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g) (Counts 3, 7); and (iv) one count of possession with intent to distribute methamphetamine on premises where a child is present in violation of 21 U.S.C. § 860a (Count 6). Defendant was arraigned on July 22, 2026, pleaded not guilty, waived his right to a speedy trial, and demanded a jury trial. Dkts. 32, 33. This Court set trial for October 26, 2026. Dkt. 35.

On September 4, 2026, Defendant filed his Motion to Suppress and accompanying request for a Franks Hearing, Motion to Suppress Statements, and Motion in Limine. Dkts. 40, 42, 44. The Government filed its Oppositions on September 9, 2026. Dkts. 46–48. On September 10, 2026, a federal grand jury returned a Superseding Indictment charging Defendant with one additional count: possession with intent to distribute (1,4-Buteanediol) in violation of 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1) (Count 8). Dkt. 49. Defendant was arraigned on the Superseding Indictment on September 16, 2026, pleaded not guilty, and demanded a jury trial. Dkt. 56. That same day, Defendant filed an additional Motion to Suppress concerning a March 10, 2026 search and seizure. Dkt. 54. Defendant filed Replies in support of his first two Suppression Motions on September 18, 2026 (Dkts. 59, 60), and the Government filed its Opposition to the additional Suppression Motion on September 22, 2026 (Dkt. 61).

On October 14, 2026, this Court held a hearing on Defendant's motions, received evidence and witness testimony, and heard arguments from counsel. Dkt. 77. At the same hearing, the parties agreed that Defendant's Motion in Limine was moot. The Court took the Suppression Motions under advisement and directed the parties to submit supplemental memoranda addressing

the remaining issues. *Id.* The parties filed their supplemental memoranda on October 16, 2026. Dkts. 84, 85.

## II. FACTUAL BACKGROUND

The factual information recited herein is drawn from the Affidavit in Support of the Criminal Complaint (hereinafter, "Affidavit"), submitted by Jared J. Lytle, a Task Force Officer with the Federal Bureau of Investigation ("FBI") and an officer with the Fairfax County Police Department ("FCPD") (Dkt. 2), the video recordings submitted to the Court, the evidence presented at the October 14, 2026 hearing, and the factual accounts set forth in the parties' filings.

At approximately 11:00 p.m. on March 10, 2026, FCPD Officer Andrew Peal recognized Defendant at a Walmart store as he was loading groceries in his vehicle (the "Subject Vehicle"). Dkt. 54 ¶ 1; Dkt. 61 at 2. Officer Peal approached Defendant after he recognized him for having an outstanding warrant in a child support proceeding. Dkt 54 ¶ 1. Officers subsequently moved Defendant away from the Subject Vehicle, handcuffed him, and placed him in a police cruiser. Dkt. 54 ¶¶ 2, 4.

While officers awaited confirmation of the outstanding warrants, officers determined that the Subject Vehicle's license plate had been issued to another car and observed a rifle and drug paraphernalia in plain view inside the Subject Vehicle. Dkt. 2 ¶ 7; Dkt. 61 at 2-3. One of the arresting officers knew that Defendant was a convicted felon, and officers further confirmed his status through a criminal-history check after Defendant was detained. Dkt. 2 ¶ 7 n.2. A search of the Subject Vehicle yielded suspected methamphetamine, suspected marijuana, packaging material, scales, police badges, a rifle, three shotguns, knives, body armor, ammunition, ammunition magazines, and $1,300 in cash. *Id.* ¶ 7. The suspected methamphetamine field-tested positive as methamphetamine and weighed approximately 3.42 ounces, including the packaging. *Id.* ¶ 7 n.3.

In the morning of March 11, 2026, Detective Lytle, accompanied by another officer present at the arrest, interviewed Defendant while he was in custody at the Mount Vernon District Station. Dkt. 42 ¶¶ 7–9. The interview began with questions about Defendant's contact information and residence. *Id* ¶ 6. Before administering *Miranda* warnings,[2] Detective Lytle then asked Defendant whether there were any weapons in the residence. *Id.* ¶ 7. Defendant responded that Lee Ann Hallman, a resident and his ex-girlfriend, owned some guns, but stated that he did not know how many. *Id.* Detective Lytle asked, "[i]f you were to guess, ten? Twenty?" Defendant answered, "probably something like that." *Id.* Detective Lytle repeated, "[t]en to twenty guns?" but Defendant did not respond. *Id.* Detective Lytle also asked about the other occupants of the residence and their relationships to one another before administering *Miranda* warnings to Defendant. *Id.* ¶ 8.

Defendant was then advised of his *Miranda* warnings, signed a *Miranda* waiver, and agreed to speak with investigators. Dkt. 2 ¶ 8. During the interview, Defendant acknowledged that he was a convicted felon and knew that he could not possess firearms, but stated that the firearms belonged to Hallman. *Id.* Defendant admitted that the marijuana belonged to him but initially denied knowing about the methamphetamine. *Id.* He later stated that he believed the methamphetamine belonged to another individual and acknowledged having previously purchased methamphetamine. *Id.* Defendant also stated that he had possessed the Subject Vehicle for five months and that he lived at a residence on Leith Place. *Id*

Investigators subsequently obtained a search warrant for the Leith Place residence, where Defendant lived with Hallman, her mother, and another man. *Id.* ¶ 9. Investigators executed the warrant on or about April 2, 2026. *Id.* In the bedroom shared by Defendant and Hallman,

[2] *Miranda* warnings emanate from the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 476, 479 (1966).

investigators recovered approximately 26.8 pounds of suspected methamphetamine, including packaging, as well as scales, packaging material, three handguns, a .22-caliber rifle, an AR-style rifle mounted on the wall above the bed, ammunition, and $2,271. *Id.* ¶ 10 & n.7.

Defendant was not present during the search of the residence. *Id.* ¶ 11. During the execution of the search warrant, investigators spoke with Hallman who estimated that there were 12 packages of "meth" in the bedroom. *Id.* She further identified the AR-15 on the wall as belonging to her deceased father and a Glock pistol as belonging to her. *Id.*

On or about April 23, 2026, investigators arrested Defendant. *Id.* ¶ 12. Defendant invoked his *Miranda* rights following his arrest but, according to Lytle's Affidavit, later made an unprompted statement to an investigator, saying words to the effect of: "this is a misunderstanding. I keep the guns for protection. I need to protect my family." *Id.*

## III. DISCUSSION

Defendant seeks to suppress various statements that he made and evidence collected on a variety of grounds. The Government argues that suppression is inappropriate. The Court will address each of the Suppression Motions in turn, beginning with his Motion for a *Franks* Hearing.

### A. *Franks* Hearing

A search warrant affidavit is entitled to a "presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Accordingly, "[a]n accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). However, a *Franks* hearing provides a narrow exception to this rule. *Id.; see also United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). To obtain such a hearing, a defendant must make a "'substantial preliminary showing' that (1) law enforcement made 'a false statement'; (2) the false statement was made 'knowingly and intentionally, or with reckless disregard for the

truth'; and (3) the false statement was 'necessary to the finding of probable cause.'" *Moody*, 931 F.3d at 370 (quoting *Franks*, 438 U.S. at 155–56).

The first prerequisite, falsity, "cannot be conclusory and must rest on affidavits or other evidence." *Id.* (citing *Franks*, 438 U.S. at 171; *United States v. Clenney*, 631 F.3d 658, 663 (4th Cir. 2011)). A defendant therefore "cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts"; rather, there must be evidence showing that the challenged statements are "objectively false." *Id.* Because warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," they "must be interpreted in a commonsense manner," and "[m]ere imprecision does not, by itself, show falsity." *United States v. Shaw*, 2024 WL 4056598, at *1 (4th Cir. Sept. 5, 2024).

"Even if falsity is established, '[t]he second showing, requiring intentional falsity or reckless disregard for the truth, is just as demanding.'" *Id.* (quoting *Moody*, 931 F.3d at 371). "An innocent or even negligent mistake by the officer will not suffice." *Moody*, 931 F.3d at 371 (citing *Franks*, 438 U.S. at 170). Instead, the defendant must provide facts, rather than conclusory allegations, indicating that the officer "subjectively acted with an intent to mislead" the magistrate. *Id.* To establish recklessness in this context, "the particular affiant must have been subjectively aware that the false statement . . . would create a risk of misleading the reviewing magistrate judge and nevertheless chose to run that risk." *Shaw*, 2024 WL 4056598, at *1 (quoting *United States v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021)).

The *Franks* framework also applies to material omissions, but "[w]hen a defendant relies on an omission, [his] heavy burden is even harder to meet." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). Because "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," the mere omission of information does not establish intentionality or recklessness. *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir.

1990). Rather, *Franks* protects against omissions "designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *Id.* at 301. In this context, "[a]n officer acts with reckless disregard when he fails to inform the magistrate of facts she subjectively knew would negate probable cause." *Haas*, 986 F.3d at 475.

Finally, the defendant must establish materiality by showing that the challenged statements or omissions were "necessary to the finding of probable cause." *Franks*, 438 U.S. at 154; *see also Moody*, 931 F.3d at 371. "A district court may not hold a *Franks* hearing where, after stripping away the allegedly false statements, the truthful portions of the warrant application would still support probable cause." *Moody*, 931 F.3d at 371. Likewise, "[o]mitted information that is potentially relevant but not dispositive [of the probable cause determination] is not enough to warrant a *Franks* hearing." *Shaw*, 2024 WL 4056598, at *2. If the defendant makes the required substantial preliminary showing, the Court must hold a hearing. *Id.* (citing *Haas*, 986 F.3d at 474). If the defendant then establishes material perjury or reckless disregard for the truth by a preponderance of the evidence, "the search warrant must be voided and the fruits of the search excluded." *Franks*, 438 U.S. at 156.

Here, the Defendant has not made a substantial preliminary showing that Detective Lytle intentionally or recklessly misled the issuing magistrate. Defendant challenges the affidavit's inaccurate recitation of his criminal history and Social Security number; its description of his estimate concerning firearms at the residence; its omission of the fact that some questioning preceded *Miranda* warnings; and its characterization of his admissions concerning the firearms and drugs recovered from the vehicle without including his accompanying denials. Dkt. 41 at 1–3. Although these allegations identify errors and incomplete descriptions, as stated above, falsity alone is insufficient and Defendant has failed to meet his burden with respect to the remaining requirements for a *Franks* hearing. *Moody*, 931 F.3d 366 at 370–71.

1. *Social Security Number/Criminal History*

All parties acknowledge that the affidavit incorrectly attributed another individual's criminal history and Social Security number to Defendant. At the motions hearing, Detective Lytle admitted making those mistakes and explained that he used a template to prepare the affidavit. Using a template does not excuse an inaccurate affidavit, but the failure to discover an error does not itself establish the state of mind required by *Franks*. Moreover, Detective Lytle's testimony at the October 14, 2026 hearing as to the fact that this was a careless mistake resulting from the use of the template appeared to the Court credible and sincere. The Fourth Circuit has recognized that small, careless errors are insufficient to meet Defendant's burden for a *Franks* hearing. *See United States v. Crowell*, 586 F.2d 1020, 1025 (4th Cir. 1978) ("The variance appears innocent and a result of simple carelessness; it does not demonstrate perjury on the part of the affiant or reckless disregard of the true facts."). Additionally, numerous courts have recognized that similar numerical errors or errors in criminal history are insufficient to establish a need for a *Franks* hearing. *See United States v. Harris*, 413 F. App'x 754, 756 (5th Cir. 2011) (incorrect apartment number); *United States v. Marion*, 547 F. App'x 283, 286-87 (4th Cir. 2013) (affirming denial of a *Franks* hearing where incorrectly identified phone number); *United States v. Shaw*, 2022 WL 1143524, at *5-9 (E.D. Va. Apr. 18, 2022) (denying request for *Franks* hearing where, among other things, affidavit incorrectly stated the wrong floor and door color of the apartment to be searched, incorrect year, make and model of the vehicle); *see also United States v. Thomas*, 852 F. App'x 189, 195 (6th Cir. 2021) (district court affirmed where inaccurate recitation of criminal history was negligent error); *United States v. Mangual*, 2026 WL 608297, at *1 (D. Vt. Mar. 4, 2026) (defendant not entitled to *Franks* hearing where inaccurate criminal history was inconsequential); *United States v. Russell*, 2009 WL 466515, at *4 (N.D.N.Y. Feb. 24, 2009)

(denying request for a *Franks* hearing where the "record demonstrates that the inclusion of the criminal history in Inv. Gayeskie's affidavit was an innocent and/or negligent mistake").

Defendant is also not able to demonstrate materiality. The erroneously included information closely resembled Defendant's actual criminal history, which included charges for possession and distribution of controlled substances and possession of a firearm with a controlled substance, as well as felony convictions involving marijuana and eluding police. Dkt. 84 at 4-5. Given those similarities, deliberately substituting the other individual's record would have served little purpose in strengthening probable cause. So too, the erroneously included social security number does little to support the Defendant's arguments. Additionally, Defendant is unable to demonstrate materiality because, even if the incorrect social security number and criminal history were excised from the affidavit, in the Court's view, there would still be probable cause for the warrant to issue given the other information included. *See Moody*, 931 F.3d at 371. The affidavit described the recovery of methamphetamine, marijuana, scales, currency, firearms, ammunition, and packaging materials from the vehicle Defendant operated. Dkt. 47-2 at 8. It also recounted officers' observations of Defendant conducting drug transactions at his former residence, identified Leith Place as his current residence, and reported his statement that narcotics were present there. *Id.* at 8, 10. Together with Detective Lytle's explanation of the evidence retained by narcotics distributors, those facts supported probable cause to search the residence independently of the challenged inaccuracies. *Id.* at 10–12.

In short, although the Court does not ratify Lytle's admittedly, careless and negligent manner of inputting information into his affidavit (and he must endeavor to do better), Defendant has failed to demonstrate that these misgivings were anything more than an innocent mistake or that it was material to the issuance of the warrant.

ii. *Other Franks Hearing Arguments*

Defendant's other arguments regarding omissions from the affidavit are even less persuasive and fail to surmount the even higher burden that rests on a defendant arguing that an omission entitles him to a *Franks* hearing. *See Haas*, 986 F.3d at 474 (when relying on omissions "[his] heavy burden is even harder to meet"). Defendant argues that the affidavit omitted both his qualifying statements concerning firearms and the fact that some questioning preceded *Miranda* warnings. Dkt. 41 at 2–3. In the questioning, Defendant acknowledged firearms at the residence, hesitantly agreed with the estimate of ten to twenty, and made statements indicating awareness of the firearms in the vehicle. Dkt. 47 at 4–6. Those statements supported the detective's summary, even though it omitted qualifications. Neither omission show that Detective Lytle intentionally or recklessly misled the magistrate or that he "subjectively knew it would negate probable cause." *Haas*, 986 F.3d at 475. Moreover, the Fourth Circuit has found that similar omissions do not entitle a defendant to a *Franks* hearing. *See Pulley*, 987 F.3d at 380 (finding no *Franks* violation where officer omitted co-defendant's denial of wrongdoing from the affidavit). Indeed, courts routinely recognize that the omission of an "initial denial" is "hardly evidence police were attempting to mislead the issuing magistrate." *United States v. Johnson*, 2007 WL 2949530, at *2 (E.D. Wis. Oct. 10, 2007). Thus, Defendant has failed to demonstrate intentionality or materiality in this regard as well.

* * *

Because Defendant has not satisfied either the intentionality or materiality requirement, his request for a *Franks* hearing and suppression on that basis is DENIED.

B. Motion Suppress Search and Seizure

The Fourth Amendment protects individuals "against unreasonable searches and seizures" and provides that warrants shall issue only upon probable cause. U.S. Const. amend. IV.

Warrantless searches are presumptively unreasonable under the Fourth Amendment, subject to limited established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Pertinent here, the automobile exception, first recognized in *Carroll v. United States*, 267 U.S. 132 (1925), permits a warrantless vehicle search where "a car is readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam). The exception rests on both the inherent mobility of vehicles and the reduced expectation of privacy in them. *See California v. Carney*, 471 U.S. 386, 390–93 (1985); *United States v. Arriaza*, 641 F. Supp. 2d 526, 533–34 (E.D. Va. 2009), *aff'd*, 401 F. App'x 810 (4th Cir. 2010). Unlike a search incident to arrest, a search under the automobile exception may seek evidence of offenses other than the offense of arrest and does not depend on the arrestee's ability to reach the vehicle. *Arriaza*, 641 F. Supp. 2d at 533–34 (citing *Arizona v. Gant*, 556 U.S. 332, 347 (2009)).

A vehicle is readily mobile if it is "clearly operational." *United States v. Brookins*, 345 F.3d 231, 238 (4th Cir. 2003). The Supreme Court has recognized that most vehicles are "obviously readily mobile by the turn of an ignition key, if not actually moving." *Carney*, 471 U.S. at 393. Further, the justification for a warrantless search

> does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam). The exception requires no separate showing of exigent circumstances. *See Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (per curiam).

Probable cause to search a vehicle exists where, under the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The inquiry considers the facts and

circumstances known to officers when the search began, viewed from the standpoint of an objectively reasonable police officer and giving due weight to reasonable inferences drawn from those facts. *See Ornelas v. United States*, 517 U.S. 690, 696, 699 (1996). Ultimately, probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Here, the warrantless search of Defendant's vehicle was permissible under the automobile exception because the vehicle was readily mobile and officers had probable cause to believe it contained evidence of unlawful firearm possession.

First, officers had probable cause before beginning the search of the vehicle. Officer Peal knew Defendant from prior encounters and testified that he was "99% sure" Defendant had a felony conviction. Officers observed ammunition, firearm magazines, and a rifle through the vehicle's windows in plain view. Dkt. 61 at 2–3. Those observations from outside the vehicle did not themselves constitute a search within the meaning of the Fourth Amendment. *See Texas v. Brown,* 460 U.S. 730, 740 (1983). Taken together, Officer Peal's knowledge of Defendant's felony status and the visible firearms and ammunition supplied probable cause to believe the vehicle contained evidence of unlawful possession. Although Officer Peal obtained definitive confirmation of Defendant's felony status after beginning the search, his existing knowledge, in hindsight, supplied a reasonable basis for that belief beforehand. Dkt. 61 at 7 n.4. Probable cause requires fair probability, not absolute certainty. *See Gates*, 462 U.S. at 238.

Second, the vehicle was readily mobile. Defendant had driven it to Walmart and was loading groceries into it when officers approached him. Dkt. 61 at 7. The body-worn camera footage further reflects that Hallman (Defendant's ex-girlfriend and current roommate) offered to drive the vehicle home, reinforcing that it remained operational. Accordingly, the vehicle satisfied the ready-mobility requirement, and the search did not violate the Fourth Amendment. *See Brookins*, 345 F.3d at 238.

Defendant's reliance on his being detained in a police cruiser and the absence of an emergency does not change that conclusion. The automobile exception requires no separate exigency, and its application does not depend on Defendant's ability to access the vehicle or drive it away. *See Arriaza*, 641 F. Supp. 2d at 533; *see also Dyson*, 527 U.S. at 466–67. Because the vehicle was readily mobile and probable cause supported the search for firearms and ammunition, the search was lawful under the automobile exception. Defendant's motion to suppress the evidence recovered from the vehicle is therefore DENIED.

C. Motion to Suppress Statements

Defendant challenges certain statements elicited from him during questioning at the Mount Vernon District Station by Detective Lytle on March 11, 2026. It is axiomatic that the Fifth Amendment protects against compelled self-incrimination. *See* U.S. Const. amend. V. To safeguard that protection, *Miranda* generally requires that warnings precede custodial interrogation before a suspect's statements may be admitted in evidence. *See Miranda*, 384 U.S. at 476, 479 (noting that "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation"). There are two general requirements for *Miranda* to apply: the defendant must (1) be in custody and (2) be subject to interrogation.

First, to determine whether an individual is "in custody" a court must decide whether, under the totality of the circumstances, the "suspect's freedom of action [was] curtailed to a degree associated with formal arrest." *United States v. Kuhn,* 809 F. Supp. 3d 326, 344 (E.D.N.C. 2025) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (quotation marks omitted). In conducting this inquiry, a court must ask whether a reasonable person would have felt that he was at liberty to leave. *Id.* Second, to determine whether question arises to the level of an "interrogation" under *Miranda*, courts not only looks to express questioning, but also to "any

words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980).

A Defendant can waive his *Miranda* rights and voluntarily answer questions in appropriate situations. The Supreme Court has held that a waiver of *Miranda* rights is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573 (1987). A statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker." *United States v. Bendann*, 180 F.4th 147, 157 (4th Cir. 2026) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). But even statements that appear voluntary might not be if the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Id.* A court must look to the totality of the circumstances to make that call.

It is also well-established that statements obtained through unwarned custodial interrogation are "presumed compelled" and excluded from the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985). However, the failure to administer warnings until midstream does not necessarily require suppression of statements made after warnings and a waiver. *Id.* at 309-10; *see also United States v. Mashburn*, 406 F.3d 303, 307 (4th Cir. 2005).

In *Elstad*, the Supreme Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314. Thus, absent actual coercion or deliberately improper tactics, the admissibility of a subsequent warned statement turns on whether it was knowingly and voluntarily made. *Id.* The mere fact that a suspect has already made an unwarned admission "does not warrant a presumption" that a later statement was compelled. *Id.* at 314. Rather, courts consider "the surrounding circumstances and the entire

course of police conduct with respect to the suspect" to determine whether the subsequent statement was voluntary. *Id.* at 318; *see also United States v. Elsheikh*, 103 F.4th 1006, 1015 (4th Cir. 2024).

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court addressed a deliberate "two-step interrogation technique," termed "question-first," whereby officers withheld warnings until obtaining a confession, then administered warnings and elicited the same admissions through further questioning. *Id.* at 604–05; *Mashburn*, 406 F.3d at 307. Although a plurality proposed a multifactor inquiry into the effectiveness of midstream warnings, Justice Kennedy concurred on narrower grounds, supplying the controlling rule in this Circuit. *See Mashburn*, 406 F.3d at 309;[3] *United States v. Khweis*, 971 F.3d 453, 461 (4th Cir. 2020); *Elsheikh*, 103 F.4th at 1015. Justice Kennedy's rule, adopted by this Circuit in *Mashburn*, limits *Seibert* to cases in which officers used a two-step interrogation "in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring); *Mashburn*, 406 F.3d at 308-09. Otherwise, *Elstad* governs the admissibility of post-warning statements. *Id.* Accordingly, if officers deliberately employed the "two-step" strategy, the post-warning statements related to the substance of the pre-warning statements must be excluded unless sufficient curative measures preceded the later statements. *Id.*; *Mashburn*, 406 F.3d at 309.

First, the Court must determine to which questions *Miranda* applies. The Defendant was in custody when he was questioned at the Mount Vernon District Station. Defendant was obviously in custody: he had been arrested, brought to the station, and initially handcuffed to the

---

[3] Although *Mashburn* arose in the sentencing context, its interpretation of *Seibert* states the governing rule for midstream warnings, which the Fourth Circuit has since reaffirmed. *See Elsheikh*, 103 F.4th at 1015; *Khweis*, 971 F.3d at 461.

wall. Although officers released his handcuffs from the wall before questioning, he remained under arrest and was not free to leave.

1. *The initial questions are covered by the Booking Exception*

Although Defendant was in custody, routine booking questions do not require *Miranda* warnings. In *Pennsylvania v. Muniz*, the Supreme Court recognized a so-called "Booking Exception" to *Miranda* for questions seeking biographical information reasonably related to administrative concerns, including a suspect's name, address, and date of birth. 496 U.S. 582, 601–02 (1990) (plurality opinion). Courts have likewise applied that reasoning to questions concerning residency and home ownership when asked for administrative purposes. *See United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004); *United States v. Toumasian*, 2011 WL 3738980, at *4–5 (N.D. Ga. Aug. 22, 2011) (finding that law enforcement officers may "ask occupants routine questions to discern who lives in a residence . . . so as to satisfy administrative concerns."). Here, the Court finds that the preliminary questions concerning Defendant's identifying information, address, and household composition, including who lived with him, his ex-girlfriend's name and relationship to Defendant, all served to establish his background and living arrangements, falling squarely within the booking exception, and were not in violation of *Miranda*,.

2. *Questioning regarding the gun*

The questioning changed character, however, when Detective Lytle asked whether firearms were present at the residence, how many were there, and who owned them. Those questions sought information about potential criminal activity rather than routine biographical information and were reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301. The booking exception does not encompass questions designed to elicit incriminating admissions merely because they follow routine background questions. *See Muniz*, 496 U.S. at 602 n.14 (noting that

"[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admission."). Detective Lytle began questioning Defendant about firearms without advising the Defendant of his constitutional rights and did not provide the appropriate *Miranda* warnings. Thus, the analysis becomes more nuanced here. The Defendant was a convicted felon, and any questions regarding firearm possession or ownership had the capacity to be inculpatory. Accordingly, Defendant's unwarned responses and the Detective's questions concerning firearms at the residence will be excluded from the Government's case-in-chief. *Elstad*, 470 U.S. at 317.

The remaining question is whether the initial *Miranda* violation also requires suppression of Defendant's statements under a theoretical "fruit of the poisonous tree analysis" after he received and waived his *Miranda* rights. Under *Mashburn*, such circumstances do not require suppression, unless the officers deliberately employed a two-step strategy to undermine the warnings or the subsequent statements were not knowingly and voluntarily made. 406 F.3d at 309–10; *see also Elstad*, 470 U.S. at 314 (noting that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to any subsequent, postwarning statement). Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id*. at 318.

The record does not establish a deliberate two-step strategy. The unwarned questioning concerning firearms was brief and occurred within the opening minutes of the interview. Detective Lytle then administered the *Miranda* warnings and obtained a written waiver before proceeding with substantive questioning concerning the items recovered from the vehicle. Defendant even attempted to correct Detective Lytle on the completeness of the *Miranda* warnings given, and initialed the waiver, indicating an understanding of his rights and voluntariness. The Court finds

that the delay in providing the warnings reflected another misgiving that the detective corrected, rather than a calculated effort to obtain admissions and then induce Defendant to repeat them after warnings. Unlike the interrogation in *Seibert*, the record does not show that Detective Lytle used an unwarned confession to pressure Defendant into giving the same confession after waiving his rights. *See Seibert*, 542 U.S. at 620–22 (Kennedy, J, concurring). Because there was no deliberate two-step strategy employed, the admissibility of Defendant's later statements therefore turns on *Elstad*'s inquiry into whether they were knowingly and voluntarily made. *Mashburn,* 406 F.3d at 309

The record establishes that the Defendant's consequent waiver was knowing and voluntary, as were the subsequent statements. When asked whether he understood his *Miranda* rights, Defendant responded, "absolutely, sir." Detective Lytle then read the *Miranda* warnings, Defendant initialed the form acknowledging them, and he signed the waiver. Dkt. 47 at 4–5. Defendant also questioned why the waiver form did not expressly state that he could stop answering questions at any time, thus demonstrating his familiarity with his rights and his active consideration of the warnings. *Id.*, at 5. His responses were clear and coherent, and the record does not indicate that his judgment was impaired or that officers obtained his waiver or subsequent statements through threats, coercion, or promises.

Considering the circumstances and the course of the interview as a whole, the Court finds that Defendant understood his rights and freely chose to speak with investigators. The initial failure to administer warnings did not render that subsequent choice involuntary. *See Elstad*, 470 U.S. at 314, 318. Accordingly, Defendant's Motion to Suppress Statements is GRANTED as to his unwarned responses concerning firearms at the residence, which the Court will suppress, and DENIED as to his responses regarding his residence and post-warning statements.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Suppress and for a *Franks* Hearing (Dkt. 40) is DENIED; and it is

FURTHER ORDERED that Defendant's Motion to Suppress Statements (Dkt. 42) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted with respect to Defendant's unwarned statements concerning firearms at his residence, which the Court will suppress and exclude. The Motion is otherwise DENIED; and it is

FURTHER ORDERED that Defendant's Motion to Suppress Evidence from the March 10, 2026 Search and Seizure (Dkt. 54) is DENIED.

It is SO ORDERED.

Alexandria, Virginia
October 20, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge